[S. F. No. 11762. In Bank.—April 29, 1926.]

## CITY OF ALAMEDA, Respondent, v. CITY OF OAKLAND, Appellant.

**[1]** MUNICIPAL CORPORATIONS—PROCEEDING TO ESTABLISH BOUNDARY LINE BETWEEN OAKLAND AND ALAMEDA—CONSISTENCY OF JUDGMENT AND PRAYER OF PETITION.—In this proceeding to establish the boundary line between the City of Oakland and the City of Alameda it is held that there is no variance between the judgment and the prayer of the petition, and that the evidence was sufficient to sustain the findings and decision of the court that said line was established by the act of 1878, which described the boundary line as "down the centre of San Antonio Creek and along the deepest water channel to the westerly boundary of Alameda County."

**[2]** ID. — LOCATION OF BOUNDARY — DOCTRINE OF ACQUIESCENCE. — Where such a proceeding is predicated on uncertainty and indefiniteness in the location of the boundary line, and no objection has been made that the proceeding was not properly taken under the act providing for such proceedings (Stats. 1921, p. 1607), and the issues presented in the case from the standpoints of both law and facts were properly the subject of legitimate controversy because of the uncertainty of the location of the boundary line, the doctrine of acquiescence is applicable to the case.

**[3]** ID.—ACQUIESCENCE IN BOUNDARY.—Where from the first incorporation of the town of Alameda the boundary line between that town and Oakland was always designated as along the center of the San Antonio Estuary, and the first freeholders' charter of the City of Oakland also fixed the boundary line of that city in the center of the estuary, as did the new and present charter of the latter city, and the City of Alameda for years actually exercised jurisdiction over the territory in dispute in this case in both a governmental and a proprietary capacity, without protest from the City of Oakland until a recent date, this was a recognition and an acquiescence of said City of Oakland in such location of said boundary line, and satisfies the requirements of the long acquiescence rule.

**[4]** ID.—INCORPORATION OF ALAMEDA — ACT OF 1878 — FINDINGS. — In such a proceeding, where the City of Oakland denied the constitutionality of the statute of February 21, 1878, incorporating the town of Alameda for the third time, and alleged that the legislature by that statute never intended to include in Alameda the

3. See 4 Cal. Jur. 432.

territory in dispute, denied the validity of Alameda's charter of 1917, in so far as it purported to include Government Island by a more particular description, said denials and allegations presented questions of law to be determined on a consideration of the statutes, and upon which no finding of fact was necessary.

[5] ID.—LOCATION OF DEEPEST WATER CHANNEL—FINDINGS.—In such a proceeding, where the City of Oakland denied that the deepest water channel in the San Antonio Estuary was in the location shown by Alameda's maps, a specific finding upon that issue was unnecessary, as it was necessarily found upon in favor of the City of Alameda when the court found the location of the disputed boundary line as the ultimate fact to be determined.

[6] ID.—RIGHTS OF CITIES ON NAVIGABLE WATERS—ACTION OF STATE—PRESUMPTIONS.—It must be assumed that the City of Oakland as incorporated, which is situated on one side of a navigable estuary, and the City of Alameda as incorporated, situated on the other side, were entitled to equal consideration at the hands of the state, and the state is deemed to have acted in a manner most conducive to the public welfare in passing statutes with reference to the boundaries of said cities and in approving their freeholders' charters.

---

(1) 28 Cyc., p. 181, n. 21. (2) 28 Cyc., p. 182, n. 30. (3) 28 Cyc., p. 182, n. 30. (4) 38 Cyc., p. 1969, n. 99. (5) 38 Cyc., p. 1969, n. 99. (6) 28 Cyc., p. 180, n. 5; 29 Cyc., p. 337, n. 61, p. 341, n. 97.

APPEAL from a judgment of the Superior Court of Alameda County. J. J. Trabucco, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Leon E. Gray, City Attorney of Oakland, and Markell C. Baer, Assistant City Attorney, for Appellant.

Wm. J. Locke, City Attorney of Alameda, for Respondent.

SHENK, J.—This is an appeal by the City of Oakland from a judgment defining and establishing that portion of the boundary line between the cities of Oakland and Alameda running westerly from the Park Street bridge in the San

---

6. See 26 Cal. Jur. 307.

Antonio Estuary to the boundary line of the City and County of San Francisco.

On the first day of March, 1922, the City of Alameda filed its petition in the superior court in and for the county of Alameda, pursuant to an act of the legislature, entitled, ''An act to provide for determining, defining and establishing the location of the boundary lines of cities, towns, counties, or cities and counties, where the same are indefinite or uncertain or have been obliterated'' (Stats. 1921, p. 1607). In the special proceeding thus authorized and initiated, the City of Alameda set forth in its petition such facts and exhibits as were deemed pertinent, relevant and essential to a proper determination of the matter, all as required by said act. It was alleged that both of said cities are situated in the county of Alameda on the eastern shore of San Francisco Bay and lie on either side of a narrow arm of salt water extending easterly from the bay for about four miles, then continuing in the form of an oval-shaped basin for approximately one mile, from whence it extends about four miles farther through an artificial canal and connects with another part of the bay of San Francisco known as San Leandro Bay; that the westerly four miles of said arm of salt water is known as ''San Antonio Estuary''; that the oval-shaped basin at the easterly end of said estuary is known as ''Tidal Basin,'' also as north or ''Brooklyn Basin''; that the artifical canal at the easterly end of said basin is known as the ''Tidal Canal''; that the City of Oakland lies on the northerly side of said estuary, basin, and canal, and that the City of Alameda lies on the southerly side thereof; that until improved, the said San Antonio Estuary was shallow and had very irregular shore lines with numerous sloughs and branches running therefrom; that the largest of said sloughs or branches ran northerly from a point near the eastern end of the estuary and connected with a body of salt water in the City of Oakland known as Lake Merritt; that about four miles east of its mouth said estuary made an irregular curve northerly, easterly, and southerly on an approximate radius of two thousand five hundred feet, passing around an irregular-shaped peninsula of high land in the City of Alameda, which formerly protruded northerly from the central portion of said City.

The petition.then set forth by reference the act of May 4, 1852, originally incorporating the town of Oakland by special enactment (Stats. 1852, p. 180), the act of March 25, 1854, incorporating the City of Oakland also by special enactment (Stats. 1854, p. 183), the act of May 15, 1861, amending the act of March 25, 1854 (Stats. 1861, p. 384), the act of April 24, 1862, also amending the act of March 25, 1854 (Stats. 1862, p. 337), the concurrent resolution filed in the office of the Secretary of State on February 14, 1889, approving the first freeholders' charter of the City of Oakland (Stats. 1889, p. 513), and a similar resolution filed on February 15, 1911, approving the new and present charter of the City of Oakland (Stats. 1911, p. 1551).

It further appears from the petition that the town of Alameda was originally incorporated by special enactment approved April 19, 1854 (Stats. 1854, p. 209). It was re-incorporated by special act approved February 21, 1878 (Stats. 1878, p. 89). The first freeholders' charter of the City of Alameda was approved by the legislature on February 7, 1907 (Stats. 1907, p. 1051), and the second charter, which is now in effect, was approved January 25, 1917 (Stats. 1917, p. 1752).

In the prayer of the petition it was sought to have said boundary line established as the same was set forth in the charter of the City of Alameda approved January 25, 1917. The pertinent part of that description, so far as the present controversy is concerned, is as follows: "Commencing at a point where the center line of the Tidal Canal intersects the western line of Park street produced northerly; thence westerly along the center line of the Tidal Canal and the north or Brooklyn Channel, through Oakland Harbor and the center line of San Antonio Estuary to its mouth, as said Brooklyn Channel and pierhead lines of San Antonio Estuary were established by the United States Harbor Line Survey of one thousand nine hundred ten; thence along the center line of San Antonio Estuary produced westerly to its intersection with the western boundary of Alameda County." In its answer the City of Oakland alleged that the southern boundary of said City "is located and lies in said estuary, basin and channel and that the major portion of said basin and channel lies north of said southern boundary and within the territorial limits of said City of Oak-

land." It also denied that said irregular-shaped peninsula of high land mentioned in the petition was within the limits of the City of Alameda. Additional allegations were set forth in the answer with reference to the legal effect of certain statutes above referred to.

The court found that the said cities are situated on either side of *the center and deepest water channel* of the San Antonio Estuary. It also found that the said peninsula was entirely within the City of Alameda. "That pursuant to an act of Congress of March 3, 1905 (33 Stats. 1117, 1142), amended March 2, 1907 (34 Stats. 1073, 1106), the United States of America, as part of a system of harbor improvements, cut a channel through and across the neck of said peninsula and deposited the spoil dredged therefrom on or about the point of said peninsula thereby creating the artificial island shown on" certain maps filed as exhibits in the case. "That Oakland and Alameda were each incorporated three different times under the old constitution by special acts of the legislature, the last of which was an act incorporating the city of Alameda on February 21, 1878, . . . That said act described the boundaries of Alameda as being 'the same as now form the said township of Alameda.' That the township boundaries thus adopted by reference were those which had been established by the Board of Supervisors of Alameda County six weeks before, to wit, on January 5, 1878, wherein that portion of the boundary line involved in this proceeding was described as being *'the centre of San Antonio Creek and along the deepest water channel.'* That this act of February 21, 1878, . . . by which Alameda was incorporated for the last time prior to the adoption of the new constitution was never repealed. That that portion of the boundary line involved in this proceeding has never been changed by the annexation or exclusion of territory under the general laws of the state or otherwise and that a line along *'the centre of San Antonio Creek and along the deepest water channel,'* as described in Alameda's incorporation of 1878, has never been disclaimed as being the same line referred to in all the freeholders' charters adopted by both cities since that time. That said line is shown and delineated on plaintiff's exhibit (K) and is particularly described as follows, to wit: (then follows the said description by courses and distances). That ever since its incorporation

of February 21, 1878, aforesaid, the City of Alameda has exercised undisputed jurisdiction in a governmental and proprietary capacity, over all the territory lying immediately south of said line, while the City of Oakland has never exercised or attempted to exercise jurisdiction of any kind or character whatsoever over said territory.'' As a conclusion of law the court decided that the act of 1878, incorporating the City of Alameda and describing its boundaries, was constitutional and valid, and established the boundary line between the said cities, and that said boundary line as so established is the line described by courses and distances in the findings of fact and that said line had been lawfully established by reason of the long acquiescence therein and its recognition by citizens, taxpayers, and public officials.

[1] It is first insisted by the City of Oakland that the judgment is at variance with the prayer of the petition. As above stated, Alameda prayed that the boundary be established as embodied in the Alameda City charter of 1917, which specified the portion of the boundary in dispute as ''along the center line of the Tidal Canal and the north or Brooklyn Channel, through Oakland Harbor and the center line of San Antonio Estuary to its mouth.'' In its findings of fact and conclusions of law the court found and decided that the said line was that established by the act of 1878 which described the boundary line as ''down the centre of San Antonio Creek and along the deepest water channel to the westerly boundary of Alameda County.'' In its answer the City of Oakland prayed that its boundary be established as that set forth in its charter approved February 14, 1889. This charter specified the said boundary as ''following the center of the slough and the center of the Estuary of San Antonio'' without adding the phrase ''along the deepest water channel'' as contained in the act of 1878. Counsel . for the City of Oakland state: ''Were it not for the addition of the phrase 'along the deepest water channel,' no difficulty would have arisen in this case because, as hereafter pointed out, under the charter of 1889, the southern boundary of Oakland was fixed in the center of San Antonio Creek. But the addition of the phrase 'along the deepest water channel' makes this boundary line antagonistic to Oakland's boundary line of 1889.'' The argument is that ''the phrase 'center of

San Antonio Creek' would be the center of the entire body of water known as San Antonio Creek inclosed within the banks of said creek, while the phrase 'along the deepest water channel' means along the deepest water channel, which may or may not be the same as along the entire channel inclosed within the banks. The two phrases are, therefore, to a certain extent, antagonistic and the second qualifies the first and limits the boundary to the center of the deepest water channel of San Antonio Creek as distinguished from the center of the entire body of water between the banks.'' It is the contention of the City of Alameda that the phrase ''and along the deepest water channel thereof'' is but an amplification of the phrase ''center of San Antonio Creek''; in other words, that the two phrases were intended to convey one and the same meaning. The trial court adopted the theory of the City of Alameda and in so doing was supported by the evidence adduced. Mr. Burnett Hamilton, city engineer of the City of Alameda, testified that he had prepared the description of the boundary line which was later adopted by the court as the true line. In connection with his testimony a map was offered and received in evidence on which the witness had platted the center line of the San Antonio Estuary approximately as it was located in 1889 and indicated the same by courses and distances by a red line drawn equidistant between the pierhead lines as established by the United States government engineers. He testified that before dredging and reclamation work had been done in the estuary it spread out at high tide over marsh-lands and tide-lands on either side and that the marsh-lands had been filled in so that the estuary now lies within well-defined banks. From his observation and experience as an engineer and from the record evidence in the case he testified that ''the center of the Estuary and the deepest water channel is approximately in the same condition to-day as it was in 1878 and 1889. . . . As near as possible the line was located midway between the pierhead lines with the idea of getting as near as may be the center of the deepest water of the channel. Because the pierhead lines usually extend out to the channel of deep water, a line midway between them would be in the deepest water of the channel as nearly as could be determined. If this red line which I have indicated on my map here were established in any other course

or at any other place, it would not, to the best of my knowledge, run along the deepest water of the channel. . . . This line which I have established, indicated on this map, designated as plaintiff's exhibit 'K,' depicting the fact that it is midway apparently in many cases between the pierhead lines, is established in the center of the estuary and along the deepest water of the channel as near as I can establish it. . . . By the phrase 'center of the channel' I mean the center of the deepest water channel.''

The foregoing and other evidence, both oral and documentary, which need not be specifically referred to, was sufficient to warrant the conclusion that when the act of 1878 defined the boundary of the town of Alameda as running down "the centre of San Antonio Creek and along the deepest water channel," and when the first charter of the City of Oakland, approved February 14, 1889, defined said boundary as "following the center of the slough and the center of the Estuary of San Antonio," and when the first freeholders' charter of the City of Alameda, approved February 7, 1907, defined said boundary line as following the "center line of the Tidal Canal," in each case one and the same line in the description was referred to and was intended by both cities and by the legislature to be the boundary line between the said cities. If, then, the statute of 1878 and the charters of 1889 and 1907 described the same boundary line, the trial court was justified in concluding, in fact was compelled to conclude, that the said boundary line was not only the legal boundary line of the City of Alameda as contended for by it, but was also the legal boundary line described in the Oakland charter of 1889 as contended for by that city. It but remained for the court to ascertain as a matter of fact the actual location of the legal boundary line (*County of Sierra* v. *County of Nevada,* 155 Cal. 1 [99 Pac. 371]). This it did by the aid of competent evidence before it. The fact that there was also evidence before the court on behalf of the City of Oakland which might be construed as contradicting the evidence upon which the court based its conclusions would not warrant a reversal of the judgment on the ground that the findings were unsupported. There is, therefore, no substantial variance between the prayer of the petition and the judgment. In fact, an examination of the judgment discloses that the

boundary line is fixed by a definite description by courses and distances without reference to the provisions of any statute or charter referred to in the pleadings. This form of the judgment was appropriate under the statute pursuant to which these proceedings were taken.

The greater portion of the peninsula of high land mentioned in the petition as "protruding northerly along said Tidal Basin from the center portion of said city" of Alameda is now an island known as "Government Island." This island was created by dredging operations and cutting an artificial channel along the southerly portion of the peninsula, terminating at both ends in the estuary, and in dredging out the north or Brooklyn channel. The city engineer testified that the original northerly boundary of the City of Alameda, following the Peralta grant line, extended entirely around the peninsula, and in this statement he was corroborated by other evidence. It is obvious that the dredging of this artificial channel would not in and of itself have the effect of excluding the island created thereby from the territorial limits of the City of Alameda if said island was theretofore in the City of Alameda, or of including the island in the City of Oakland if it was not theretofore included. Prior to the adoption of the first Alameda charter of 1907 there was only one channel in the estuary, and the description in that charter was therefore properly caused to follow "the center line of the Tidal Canal," but between 1907 and the adoption of the second charter of Alameda, in 1917, the federal government had cut the new channel across the neck of the peninsula. It was therefore properly deemed necessary to specify in the second charter which of the two channels was the boundary line, and the description was accordingly caused to proceed along "the center line of the Tidal Canal and the north or Brooklyn Channel."

In its answer the City of Oakland denied the validity and constitutionality of the act of February 21, 1878, in so far as said act purported to include within the boundaries of the town of Alameda any territory already included in the town of Oakland under the act of May 15, 1861, and the act of April 24, 1862, which specified the boundary of the City of Oakland as "along the eastern and southern highest tide line of said slough, and of the estuary of San Antonio." It

is the position of the City of Oakland that as it had jurisdiction under the acts of 1861 and 1862 to the southern high-tide line of the estuary it was not competent for the legislature by the act of 1878 to include within the boundary of Alameda the strip between the center of the estuary and the southerly high-tide line, and that the act of 1878 was therefore unconstitutional to that extent, under the authority of *Petition of East Fruitvale Sanitary Dist.*, 158 Cal. 453 [111 Pac. 368]. It may be assumed that even under the constitution of 1849 the legislature could not, by special act or otherwise, include a portion of the territory of one municipality within the limits of another municipality, but it would not necessarily follow that under the facts presented in this case the judgment should be reversed. Subsequent legislation, adjudications, and facts shown in evidence have rendered the alleged conflict between the acts of 1861 and 1862, on the one hand, and the act of 1878, on the other, quite immaterial. It was held in the case of *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 [50 Pac. 277], that by the proper construction of the original act of incorporation of the town of Oakland of May 4, 1852, the southerly line of San Antonio Creek or estuary intended by the act was the line of low tide and not the high-tide line, and that the act of 1854, inferentially, and the acts of 1861 and 1862, by direct language, purporting to extend the southern boundary of the City of Oakland to the "high" and "highest" tide lines, were nugatory. True, the case just cited primarily involved conflicting claims to real estate and the land granted to the town of Oakland by the original act of incorporation, but incidentally and necessarily it also involved the location of the boundary line. The determination in that case therefore resulted in the alleged overlapping of the territory of the two municipalities only to the extent of a strip of land between the center of the estuary and the southerly low-tide line, a strip of land completely and continuously covered by water.

It is noted that the Oakland charter of 1889 fixed the southern boundary along "the center of slough and the center of Estuary of San Antonio," thus contracting its southern boundary by eliminating the strip of submerged land and constituting the alleged overlap. It was observed in *People* v. *Oakland Water Front Co.*, 118 Cal. 234 [50 Pac. 305], that more recent legislation (presumably the Oakland

charter of 1889) had "contracted the southern boundary of Oakland so as to exclude from its limits the southern half of the estuary, and this amounts to a renunciation on the part of the city and resumption by the state of the control of so much of the grant as may have been covered by the excluded portion of the city." It seems to be conceded by all parties that there was not in effect at the time of the approval by the legislature of the Oakland charter of 1889 any law of the state prohibiting a municipality from contracting its boundary and thus excluding a portion of its territory in the manner pursued by the City of Oakland, viz., by the adoption of a freeholders' charter. But it is insisted by the City of Oakland that the existence of general laws of the state, particularly the act of 1889 (Stats. 1889, p. 358), prescribing the mode and manner of changing the boundaries of municipal corporations, including the annexation of territory thereto, was an effectual bar to the inclusion of said strip of land in the City of Alameda through the medium of the description of the boundaries of that City as included in its freeholders' charter adopted in 1907. The answer of the City of Alameda is that the City of Oakland is not in the position to raise this question by reason of long acquiescence in the location of the boundary as contended for by the City of Alameda. The rejoinder of the City of Oakland is that while the doctrine of long acquiescence is admittedly applicable in cases where the location of the boundary line is indefinite and uncertain, there is no uncertainty in the description in this case and consequently no occasion for the application of the doctrine of acquiescence.

[2] The contention of the City of Alameda must be sustained. This proceeding is predicated on uncertainty and indefiniteness in the location of the boundary line. The act under which it was taken provides for a proceeding thereunder only when the location of the boundary lines of the city are "indefinite or uncertain or have been obliterated." No objection has been made that this proceeding was not properly taken under that act. The issues presented in this case from the standpoint of both the law and the facts were properly the subject of legitimate controversy because of the uncertainty of the location of said boundary line and were therefore the proper subject of the application of the doctrine of acquiescence. (1 McQuillin on Municipal Corporations, sec. 260; 28 Cyc. 182; *People* v. *Town of Antioch*, 17

Cal. App. 751 [121 Pac. 945]; *Belknap* v. *City of Louisville,* 93 Ky. 444 [20 S. W. 309]; *Louisiana* v. *Mississippi,* 202 U. S. 1 [50 L. Ed. 913, 26 Sup. Ct. Rep. 408, see, also, Rose's U. S. Notes].) The latest exposition of the doctrine of acquiescence, with its application to an interesting state of facts in the consideration of the present controversy, is found in *Michigan* v. *Wisconsin* (U. S.), 70 L. Ed. (Adv. 269) [46 Sup. Ct. Rep. 290], decided by the supreme court of the United States on March 1, 1926. There can be no question of the efficacy of the rule in cases properly coming within its purview.

[3] What, then, are the facts in this case which bring it within the rule? It is to be remembered that from the first incorporation of the town of Alameda, in 1854, the boundary line in dispute was always designated as along the center of the San Antonio Estuary. The first statute was an attempt on the part of the legislature to fix the boundary line at that location, and would constitute some recognition on the part of the state that such was the boundary. The same may be said of the statutes of 1872 and 1878, reincorporating the town. We then find the first freeholders' charter of the City of Oakland fixing the boundary of that city in the center of the estuary. It would be difficult to imagine a more solemn recognition and acquiescence on the part of the City of Oakland of the location of said boundary than by the vote of its people in adopting its freeholders' charter in 1889. The approval of that charter by the legislature in the same year is persuasive of the acquiescence of the state in that location of the boundary line. A like situation was presented when the new and present charter of the City of Oakland was adopted by the people of that city in 1911 and approved by the legislature in the same year, fixing in effect, but with slightly different wording, the boundary line in the center of the estuary. From the very beginning of the town of Alameda as a municipal corporation, in 1854, to the adoption of its latest charter, in 1917, its northern city boundary of record was the center of the estuary. During all that time the City of Alameda would seem to have possessed a colorable claim to its boundary in that location, and the contraction by the City of Oakland of its boundary to that line in 1889 was a recognition by Oakland that such was the true line at that time. And since 1889 the state has unquestion-

ably acquiesced in the attitude of both cities as to their common boundary line.

Furthermore, it appears that the City of Alameda for years has actually exercised jurisdiction over the territory in dispute in both a governmental and a proprietary capacity. It has levied and collected taxes without protest on the property located in said territory. It has furnished light and power from its municipal lighting plant in said territory. The police and fire departments of the City of Alameda have served this territory. All of these conditions have existed without any protest or adverse claim of right on the part of Oakland, until long after the creation of Government Island by the construction of said artificial canal. It would seem to follow, and we do readily conclude, that the facts herein presented satisfy the requirements of the long acquiescence rule. It is also apparent that the trial court was justified in concluding that the boundary line of the City of Alameda, as originally established and as later confirmed and acquiesced in and as determined by the judgment herein, did not depend upon nor was it referable for its location to any general law of the state concerning the annexation or exclusion of territory.

[4] In the answer of the City of Oakland it denied the constitutionality of the statute of February 21, 1878, incorporating the town of Alameda for the third time; it alleged that the legislature by that statute never intended to include in Alameda the territory in dispute; denied the validity of Alameda's charter of 1917 in so far as it purported to include Government Island by more particular description. It is insisted that the findings are silent upon the issues thus tendered and that such failure to find thereon renders the decision against law. We think the said denials and allegations presented questions of law to be determined on a consideration of the statutes and upon which no finding of fact was necessary. [5] It was also denied in Oakland's answer that the deepest water channel in the San Antonio Estuary was in the location shown by Alameda's maps, nor was it in any other location than as shown by its map, and complaint is made because a specific finding was not made upon that issue as tendered. There is no merit in the contention for the reason that said issue was necessarily found upon in favor of the City of Alameda when the court found

the location of the disputed boundary line as the ultimate fact to be determined.

[6] In conclusion it may be well to say that we are convinced that the findings and judgment of the trial court were in harmony with the requirements and necessities of both municipalities. The state acts for the public good and, in passing the statutes above referred to and in approving the freeholders' charters of the cities involved herein, the state is deemed to have acted in a manner most conducive to the public welfare. The City of Oakland as incorporated was situated on one side of a navigable estuary and the City of Alameda as incorporated was situated on the other side. It must be assumed that each was entitled to equal consideration at the hands of the state. "These communities . . . had a natural right to this body of navigable water, to unrestricted access to its shores, and to the privilege of constructing wharves, docks, piers and other aids to commerce. . . . " (*Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160, 172 [50 Pac. 277, 281].) In fixing the boundary line, by competent and sufficient evidence as we have concluded, in the center of the estuary and along the deepest water channel, the judgment of the trial court would seem to have conserved that natural right.

The judgment is affirmed.

Waste, C. J., Curtis, J., Seawell, J., Richards, J., Cashin, J., *pro tem.,* and Lennon, J., concurred.

Rehearing denied.