HOTEL LAST FRONTIER CORPORATION, A CORPORATION, APPELLANT, v. FRONTIER PROPERTIES, INC., A CORPORATION, RESPONDENT.

No. 4572

October 18, 1963                    385 P.2d 776

See also 79 Nev. 150, 380 P.2d 293.

*G. William Coulthard* and *Franklin N. Smith,* of Las Vegas, for Appellant.

*Calvin C. Magleby,* of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, C. J.:

This is an appeal from a final judgment in an action for declaratory and injunctive relief brought by respondent to obtain a declaration of the rights and obligations of the parties under a lease from the appellant

lessor to the respondent lessee, with reference to the insurance to be carried upon the leased premises, improvements and contents. The lease embraced the resort hotel, casino, and other properties known as "The New Frontier" in Las Vegas. The personal property situate in the buildings was inventoried in detail. The property was leased for a period of 10 years, commencing January 1, 1959, and is dated September 30, 1958.

Despite the fact that the instrument was drawn with great care and comprises 24 typewritten pages, it was found necessary to add addenda, December 11, 1958, in which the original instrument is amended in numerous respects.

The only problem presented on this appeal arises out of a single subparagraph contained in paragraph No. XIII of the original lease entitled "Insurance," and paragraph No. 17 of the addenda. The second subparagraph of paragraph XIII referred to reads as follows:

"Lessee shall, at its own expense, keep any and all buildings and improvements and personal property on the leased premises insured against fire and extended coverage in an amount equal to ninety (90%) per cent average clause attached, and loss payable under any and all such insurance policies to any lien holders and lessor and lessee as their respective interests may appear."

The amendment reads as follows:

"17. Add to the first full paragraph on Page 14:

" 'Lessor may at its election procure insurance up to 100% of the replacement cost of the demised premises at its expense by paying the additional premiums for the difference between 90% and 100% of replacement cost.' "

Plaintiff's amended complaint in seeking a declaration of the rights and obligations of the parties recited, among other things, paragraph XIII of the lease in full, paragraph XX defining default and the rights of the lessor thereunder, and asserts that the lessor has demanded that lessee pay the premiums on the insurance placed by the lessor on the basis of 90% of replacement value of the improvements and 90% of the actual value of the personal property and also the costs of financing the said insurance over a period of 40 months, contrary

to the terms of and far in excess of the amounts payable by the plaintiff, and contrary to the provision of the lease that said payments were to be made monthly to the extent of 1/60 of the total amount payable for insurance over the 5-year period of the policies; and that the defendant has threatened cancellation of the lease; that plaintiff offered to pay into court the sum of $13,900.48, later changed to $17,902.48 for premiums for fire and extended coverage and public liability insurance for the months of September, October, November, and December, 1960, and to deposit in court monthly thereafter on account of said premiums the sum of $3,475.62.

Defendant answered and, in addition to certain admissions and denials, alleged that the best term of insurance that could be financed was for a period of 42 months requiring a down payment of $32,133.08 (which included payments of $4,682.06 per month for September to December, 1960, inclusive, and two additional monthly payments of $4,682.06 each, and 35 monthly payments of $3,258.47 each, payment of the remaining balance. It alleged certain additional breaches of the lease and sought judgment for the sum of $32,133.08, representing the down payment paid by defendant to A.F.C.O., the insurance premium financing firm, to institute said insurance and for the further payment of $4,682.06 for January, 1961, and certain further relief. The total demanded for the 5-year period is $174,271.89. This, however, includes $18,458.26 which is not in dispute.

The case was tried and submitted to the court without a jury on the following stipulated issues:[1]

"(A) The issue of whether Plaintiff is required to pay the cost of financing monthly premiums of insurance for fire and extended coverage and public liability insurance, and whether said monthly premiums are payable over the term of the financing contract therefor, or over the life of the policies.

---

[1]The stipulation provided for the deposit in court of certain sums and for an appraisal to be made and for increase or decrease in premiums in accordance with such appraisal, and further provided that the lessor would not attempt to cancel the lease for nonpayment of insurance premiums, provided that the lessee pay $17,500 into court and $3,500 a month and other details not affecting the disputed issues.

"(B) The issue of whether the insurance procured for fire and extended coverage insurance shall be based upon ninety percent (90%) of replacement cost of buildings and contents, or based upon ninety percent (90%) of the insurable cash value thereof, under said lease of September 30, 1958, as amended."

The court's decision is reflected by a minute order, June 20, 1962, as follows:

"This matter having been heretofore submitted to the Court for decision, by the Court ordered that the lessee pay all premiums upon the sound value and the recommended insurance value, the same being the new replacement cost as $4,443,525, the recommended insurable value as $4,115,418, the sound value at $3,385,568 and the recommended insurable value as $3,135,419. Judgment may enter accordingly."

On July 6, 1962, the court found inter alia as follows:

"III. The Court finds in favor of the Plaintiff and against the Defendant on each of the two [stipulated] issues * * *.

"IV. That the insurable cash value of the buildings and the contents thereof subject to the lease described in the Complaint was and is $3,135,419.00.

"V. That Plaintiff is obligated to pay the premiums on fire and extended coverage insurance on said buildings and contents in a sum equal to 90% of $3,135,419.00 and no more.

"VI. That Plaintiff is not obligated to pay the cost of financing said insurance and is entitled to pay the premiums on such insurance in monthly installments over the life of the policies evidencing the same without interest."

This was followed by the court's conclusions of law in the identical language contained in findings numbered IV, V, and VI, and the court entered judgment in the identical language of said conclusions. Appeal was taken from the judgment.

Appellant filed no specifications of error, but we glean from the discussion in appellant's opening brief that error entitling appellant to a reversal is assigned as follows: (1) insufficiency of the findings; (2) error

in the court's determination that the lease was ambiguous and in its construction of the lease after receipt of evidence to explain the ambiguity; (3) error in not giving effect to a practical construction given to ambiguous provisions in the lease by the actions of the parties thereto; and (4) error in not assessing damages against respondent in the amounts actually paid by appellant to obtain the insurance in question. We treat of these in the order recited.

(1) The attack on the findings is based upon the violation of NRCP Rule 52 (a), reading in pertinent part as follows: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *." Subdivision (b) of the rule provides for an amendment of the findings on motion. The question of the sufficiency of the evidence to support the findings was not made in the court below, nor did appellant move to amend findings.

For the most part, the issues which the court was called upon to decide under the stipulation were legal issues, requiring only the court's conclusions. City of Alameda v. City of Oakland, 198 Cal. 566, 246 P. 69; Peak v. Republic Truck Sales Corporation, 194 Cal. 782, 230 P. 948; Griffith v. Maxfield, 62 Utah 51, 218 P. 105. The court was primarily called upon to construe and interpret portions of the lease and the amending addenda which appeared to be in conflict. Both parties to the action introduced evidence to explain such apparent conflict. This left for determination one factual question, namely, the statements and actions of the parties asserted by appellant to have placed their own construction on the instruments. This undoubtedly required a factual determination, and it would have been in order for the appellant to have sought from the trial court a finding on such action. However, when we read the findings and conclusions it is evident that, if nothing more, they contain an implied finding that the court rejects appellant's contention of such factual interpretation. This becomes clear in our discussion infra of the main

assignment of error. We find no reversible error in the court's failure to make more specific findings on the question of practical interpretation.

(2) Appellant next asserts at some length that whether a contract or lease is ambiguous or uncertain is a question of law and the lower court's finding or determination is not binding upon the appellate court, and if it is found by the trial court to be ambiguous or uncertain, it is primarily that court's duty to construe it after full opportunity to the parties to produce evidence of the facts, circumstances, and conditions surrounding its execution and the conduct of the parties thereto; that the construction of a contract is always a matter of law for the court, no matter how ambiguous, uncertain or difficult its terms; that in the present instance a careful reading of the parts of the instruments in question discloses the definite existence of an ambiguity or of an uncertainty, or of both, and the question must ultimately be determined by the appellate court; that in the instant case parol evidence was properly admissible. We may concede the propriety of such contentions, but we are left in the dark as to what error is predicated by reason thereof. The trial court did construe the instruments and resolved the conflict. It did permit both parties to introduce evidence on the practical interpretation issue. This precise assignment of error, if it may be considered such, is without merit.

(3) Appellant's next assignment appears to be that the court's findings and conclusions were contrary to the practical construction placed upon the ambiguous provisions by the parties through their conduct. The conduct relied upon is as follows: At the time of the execution of the lease and addenda, or amendments (both instruments were bound together and were duly executed prior to the effective date of the lease), sundry insurance policies, theretofore maintained by the lessor, were in effect, under 5-year contracts, which at the time of the negotiations had approximately three years to run. The premiums were paid by the lessor who billed the lessee therefor during the period of time heretofore

described in this opinion, and included separate items for the premium and the financing charge and interest.[2] These bills were paid by the controller of respondent corporation, but the evidence is in dispute whether the manager of the corporation knew of such situation and whether the respondent corporation itself was chargeable with such knowledge so as to constitute its own practical construction of the lease and option in this respect, and of the fact, first, that the insurance was based upon 90% of the replacement cost (with the resulting increased rates and amount of what would have resulted from an insurance of 90% of the actual value) and also the matter of payment of financing charges.

The respondent's manager (president and chairman of the board) testified that for the remaining approximate 3-year period for the prior existing policy he paid $3,500 monthly, based on 1/60 of the insurance cost at the time it was placed, and that he had no knowledge that he was paying or was being billed for interest payments or finance charges during such 3-year period until after the controversy arose, and that this was when he commenced this action. He testified that he was able to obtain insurance on his other properties without paying carrying charges or any interest, although the premium payments were paid on an installment basis. He also testified on cross-examination as follows:

"Well, Mr. Friedman said that, told me, he said 'Now, we have the property insured and we've used two years of the insurance or some two years, three months, something of this description'. He said 'We have five years policies, how would it be until it runs out if you pay 1/60th of it'. Now, I had no knowledge that this was financed from that standpoint because if it was divided up under 1/60th, I would be paying for carrying the previous two years that he was carrying the three years insurance that I was going to have to pay because the finance charges would have been added to it and I would

---

[2]Items included, in addition to fire and comprehensive coverage, liability and crime, rental income insurance, plate glass insurance, boiler and auto insurance. Such latter items form no part of the issues submitted to the court.

have had no recovery from that whatsoever for the age of the policies up until the time I took them over. I considered I was paying 1/60th of the insurance premium, not 1/60th of the insurance premium and carrying charges."

We are satisfied that there was ample substantial evidence to justify the trial court in its refusal to find that the practical interpretation of the parties fixed the liability of respondent for the future insurance policies to be taken out on the basis claimed by appellant, and in interpreting the situation as one in which the lessor had represented and the lessee had accepted the situation as one in which on the existing policies that had some three years to run it was to the financial interest of the lessee to continue those existing policies in force during the remainder of their respective terms rather than to cancel them, thus subjecting the lessee to short-term premium rates, and had no bearing upon the new policies to be taken out under the terms of the lease and the amendment thereto.

(4) Appellant next appears to assign as error the failure of the court to assess respondent with damages corresponding to the amount that appellant was compelled to pay for premiums and financing charges on the insurance taken out by him because "the measure of damages applicable in suits on ordinary contracts of indemnity is the loss actually sustained or the amount actually paid." The entire discussion of this subject is without point. The assignment is without merit.

(5) We turn then to the main issue involved. We have quoted supra the lessee's covenant to keep the buildings and improvements and personal property insured against fire and extended coverage "in an amount equal to 90% average clause attached." Appellant's main support for its contention that this means 90% of replacement value grows out of amendment No. 17 which adds to the second paragraph "XIII (Insurance)" the following: "Lessor may at its election procure insurance up to 100% of the replacement cost of the demised premises at its expense by paying the additional premiums for the

difference between 90% and 100% of replacement cost."
Appellant lessor insists that the only way this amend-
ment makes sense is its indication that the lessee is to
pay the first 90% of the premium on replacement cost
insurance. We must first, then, ascertain the meaning of
the insurance clause in the lease before the amendment
that the lessee keep the premises insured "in an amount
equal to 90% average clause attached." The witness
Smith testified as an expert insurance broker and agent
that this has a definite meaning. He first testified that
he was familiar with the 1943 New York Standard Form
of Fire Insurance Policy referred to in NRS 691.040.[3]
Smith testified: "A. The average clause in insurance
is a clause which permits an insurance buyer and the
insurance company agrees to give a reduced rate, if the
buyer will purchase insurance up to the amount of that
stipulated percentage. Q. Now, is there a standard
average clause attached to the 1943 New York Standard
Form of fire insurance? A. The standard form has
none but it is added by endorsement. Q. What is that,
the standard form or standard endorsement? A. It's
called an average clause endorsement. It has a blank
space for the amount, the application of the percentage,
either 70 percent, starting with 70 percent usually, 80
percent, 90 percent or 100 percent average clause. Q.
And is that clause written based upon replacement costs
or sound value costs? A. The average clause attached
to the basic New York standard policy, is on sound
value. Q. And so when the lease agreement provides as
it does on Page 14, 90 percent average clause attached,

---

[3]"1. The standard fire insurance policy known as the 1943 New
York Standard Form of Fire Insurance Policy, a copy of which was
filed by the commissioner in his office on September 15, 1943, with
the date of such filing endorsed thereon by him, is hereby adopted
as the standard form of fire insurance policy for this state. All such
1943 New York Standard Form of Fire Insurance Policies issued or
outstanding in this state after September 15, 1943, shall be valid.
No fire insurance policy or any renewal of any such policy on prop-
erty in this state shall be issued or delivered in this state after
April 1, 1947, in other than such standard form, except only as
provided in this section and the following sections of this chapter,
and except that there may be issued riders, endorsements, clauses,
permits, forms or other memoranda, to be attached to and made a
part of such fire insurance policy not inconsistent therewith."

the average clause under the standard New York policy is based upon sound value. Is that correct? A. Yes sir."

Although not introduced in evidence, we take judicial notice of the 1943 New York Standard Form of Fire Insurance Policy on file in the office of the State Insurance Commissioner of Nevada and of the standard forms to be used for attachment thereto. Aldrich v. Great American Insurance Co., 195 App.Div. 174, 186 N.Y.S. 569, 571; NRS 691.040. See also 14 Vanderbilt L.Rev. 779; 1960 Wis. L.Rev. 39.

The "Standard Form" No. 29 "average clause" to be "attached to and forming a part of" the basic policy first contains blanks to identify the number of the policy and the parties, and contains the following: "It is expressly stipulated and made a condition of the contract that, in event of loss, this company shall be liable for no greater proportion thereof than the amount hereby insured bears to_____ per cent of the actual cash value of the property described herein * * *."

Standard Form 475 "Replacement Cost Endorsement" recites: "This endorsement is only for use on a policy which contains the required average clause." It recites that it is issued in consideration of the application of the average clause provisions, and in consideration of the premium, and specifically provides that the provisions of the policy applicable to the property described "are amended to substitute the term 'replacement cost' for the term 'actual cash value' wherever it appears in this policy." Other provisions are inserted which are not pertinent. These standard forms have to do with what is generally referred to as co-insurance, and which serve under varying circumstances to reduce the premium rate. While there is nothing to indicate that the insured after taking advantage of the rates provided by the "average clause" and becoming thus a co-insurer for the loss above the agreed percentage of the actual cash value, may not also take advantage of Standard Form 475 (but only if he has also used Form 29) and effect insurance at an agreed percentage of replacement cost, this would require attachment of both of the forms referred to. However, there is nothing in paragraph XIII (Insurance) of the lease to indicate any such intention. Insurance in an amount equal to 90% average

clause attached is clearly indicated. That the terms used in amendment No. 17 may be used as a definition of the lessee's obligation under subject paragraph XIII of the lease did not appear reasonable to the learned district judge and likewise does not appear reasonable to us. Amendment 17 was obviously made to provide an additional right in the lessor. In so doing, it blundered into language that appeared to affect the obligation of the lessee.

As to the installments and the financing charges for arranging for payments in monthly installments it must be noted that there is a total absence of any reference thereto in the lease or the amendments thereto. There is a specified provision in the lease that the lessee may pay the premiums on the basis of "equal monthly installments." This indicates a monthly payment for the 5-year term and the trial court properly so held.

We have carefully considered other points discussed in the briefs but find it unnecessary to comment on them. Under the limited issues stipulated for determination to the district court, we find no error in the judgment. The same is affirmed with costs.

McNAMEE and THOMPSON, JJ., concur.