[Sac. No. 1339. Department Two.—December 28, 1908.]

## COUNTY OF SIERRA, Respondent, v. COUNTY OF NEVADA, Appellant.

BOUNDARY LINE BETWEEN SIERRA AND NEVADA COUNTIES—SOURCE OF SOUTH FORK OF MIDDLE YUBA RIVER.—The boundary line running east and west, which divides Sierra County on the north from Nevada County on the south, as established by section 3921 of the Political Code, is a line running westerly from the state line to the source of the South Fork of the Middle Yuba River, and down the South Fork and Middle Yuba River to a point ten miles above the mouth of the latter. The source of the South Fork of the Middle Yuba River, as fixed by the trial court upon sufficient evidence, consists of several springs in the Sierra Nevada Mountains, situated about eight miles above the point where the South Fork empties into the Middle Yuba, and is not the body of water known as English Lake, situated about three miles above the junction of the South Fork with the Middle Yuba.

ID.—LOCATION OF BOUNDARY QUESTION FOR TRIAL COURT—EVIDENCE—APPEAL.—In an action between such counties, involving the determination of the location of such boundary line, the question as to what constituted the South Fork and its source is one of fact for the trial court. Where the evidence is conflicting on that point, the conclusion of the trial court will not be disturbed on appeal.

ID.—WATERCOURSE — DRY CHANNEL. — A watercourse does not lose its character as such because in dry seasons, or under certain climatic conditions, its channel may become dry in places.

ID.—CONSTRUCTION OF ACT ESTABLISHING BOUNDARIES—LEGISLATURE PRESUMED TO KNOW LOCATION OF NATURAL OBJECTS.—When the

CLV Cal.—1

legislature, by the act of 1856 (Stats. 1856, p. 143), defined the northern boundary line of Nevada County, and the southern boundary line of Sierra County, substantially as said line is now defined by the Political Code, it must be assumed that it had full knowledge respecting those matters concerning which it was legislating, and that in fixing the boundaries of such counties by reference to streams, it then knew the location, trend, and source of such streams.

ID.—JURISDICTION OF EQUITY IN ACTION INVOLVING TERRITORY CLAIMED BY TWO COUNTIES—LEGAL REMEDY INADEQUATE.—A county may maintain an action in equity against an adjoining county to restrain the latter from exercising jurisdiction over territory alleged to be situated within its boundaries, but claimed by the latter to belong to it, where the defendant county admits the exercise of jurisdiction, and asserts the right to exercise it, in the disputed territory, and there is uncertainty and dispute between the counties as to the actual location of the boundary line, and a necessity of construing the statute defining such boundary in order to determine its location. Under such circumstances, the special legal remedy for the determination of a disputed boundary line under sections 3969-3972 of the Political Code is not an adequate remedy at law.

APPEAL from a judgment of the Superior Court of Plumas County.  J. D. Goodwin, Judge.

The facts are stated in the opinion of the court.

George L. Jones, District Attorney, and Thomas S. Ford, for Appellant.

W. I. Redding, District Attorney, Frank R. Wehe, and Solinsky & Wehe, for Respondent.

LORIGAN, J.—This action was brought in the superior court of Plumas County by the county of Sierra against the county of Nevada for the purpose of securing an injunction against the exercise by the latter county of jurisdiction over certain territory claimed by the former, the main point in the controversy, however, being as to the location of the boundary line running east and west which divides Sierra County on the north from Nevada County on the south.

The complaint alleged that the true southern boundary of the territory of Sierra County, lying between said county and the territory which constitutes the county of Nevada as established by law, has since the year 1874 been, and still is, as the statute of that year (Pol. Code, sec. 3921) established the same, to be as follows: "Thence south on said state line

(state of Nevada) to the northeast corner of Nevada County, a point east of the source of the South Fork of the Middle Yuba River; thence west to the source of, and down the South Fork of the Middle Yuba River to a point ten miles above the mouth of the latter."

The complaint then designated the particular location of said boundary line by reference to United States government surveys, and then alleged that the county of Nevada had been, for some years past, encroaching on the jurisdiction of Sierra County over portions of its territory north of its boundary line and was claiming jurisdiction over a strip of land north of said boundary about 25.56 miles in length and averaging 1.22 miles in width, and containing over 31.29 square miles, and had actually attempted to exercise jurisdiction within said strip by the levying and collection of taxes therein and in divers other ways; that no survey fixing the line between said counties could be had until the disputed boundary was settled; that plaintiff had no adequate remedy at law, and on account of such proceedings on the part of Nevada County, and in order to avoid a multiplicity of suits among the persons occupying said disputed territory, the right to equitable redress had arisen.

The prayer was that the disputed boundary be established by the court to be as claimed by the plaintiff, and that Nevada County be enjoined from asserting jurisdiction over the territory north of said boundary line.

The answer of Nevada County expressly admitted that the true boundary line between the counties was as averred in the complaint,—namely, from the state line "west to the source of the South Fork of the Middle Yuba River and down the South Fork and Middle Yuba River to a point ten miles above the mouth of the latter," but expressly denied that the location of the boundary line with reference to the government surveys was as described in the complaint, but on the contrary alleged four distinct lines, widely separated from each other and all different from the line claimed by Sierra County, and each of which lines Nevada County alleged was the true east and west line, and, hence, the true boundary line between the counties.

The trial court found the true boundary line to be as alleged by Sierra County and particularly described in the com-

plaint by reference to United States government surveys, and entered a decree so establishing it, and enjóined Nevada County from exercising any jurisdiction or governmental power over any territory north of said established line.

Nevada County appeals from the judgment, bringing up the evidence on a bill of exceptions in an attack upon the findings of the court.

It will be observed that the act of 1874 (Pol. Code, sec. 3921) in designating the southern boundary line of Sierra County fixes its point of commencement on the state line (state of Nevada) at a point east of the "source of the South Fork of the Middle Yuba River, thence west to the source of and down the South Fork and Middle Yuba River."

The main contention between the counties in the trial court was as to the location of the point described as the "source of the South Fork of the Middle Yuba River" and the location of the South Fork itself. It was agreed between them, that the true boundary line between the counties was a line running westerly from the state line to the source of the South Fork and down the channel of that stream to the junction of the Middle Yuba, but the main contention was as to where was the source of the South Fork, and where was the South Fork of the Middle Yuba located. It was the contention of the respondent, and the court so found, that the source of the South Fork consisted of several springs in the Sierra Nevada Mountains; that the waters therefrom collect and form into a stream which runs down to the middle of the main valley, or depression and watershed, in a general northwesterly course in a well-defined natural channel, with bed and banks, until it empties into the Middle Yuba River and that the stream taking its source in said springs and emptying into the Middle Yuba is the South Fork of that river.

From the source of the South Fork as fixed by the court to where its water emptied into the Middle Yuba River is about eight miles.

While the contention of the appellant was against this claim of respondent, and while it alleged that the South Fork took its source at several other points than as claimed by respondent and found by the court, its principal claim, and that to which its evidence was practically addressed was, that the true source of the South Fork was in a lake which was designated

by the witnesses for appellant as English Lake and which was many miles westerly from the source established by the findings of the court. This body of water, which when speaking as of the time of its existence, is characterized as a lake, was located about three miles above the junction of what is conceded to be part of the South Fork with the Middle Yuba, and about five miles down stream from the source of what the court found was the South Fork of the Middle Yuba. This body of water, designated as English Lake, was not a natural lake but simply an artificial reservoir. It appears that about three miles above the mouth of the South Fork that stream in its unrestrained condition runs through a narrow gorge in the mountains. At some date, not earlier than 1861, the Milton Water Company for the purpose of impounding and appropriating the waters of the South Fork and its tributaries and conveying them to another watershed, built a dam across the South Fork where it passed through the gorge. This dam was one hundred and thirty feet in height and was known as the English dam. The high mountain ranges through which the South Fork takes its course separate just above where the dam was constructed, leaving a small valley between, known as Musco valley, and which is located on the north side of the South Fork stream. When the dam was constructed its effect was to back the waters of the South Fork up its channel to the southeast some nine thousand feet, or nearly two miles, in the valley and for a width of some eighteen hundred feet. This body of water was called English Lake, and it is claimed by appellant that this large body of water, which existed in 1874, when the legislature fixed the southern boundary of Sierra County, must be deemed to have been meant as the source of the South Fork of the Middle Yuba River. The dam which held this water broke in 1883, the immense body of water was precipitated into the cañons and valleys below and the dam was not thereafter rebuilt. Aside from the fact that this reservoir with its large body of water was in existence in 1874 when the act establishing the southern boundary of Sierra County was passed, and independent of it, it is further contended by appellant, that in prehistoric times a large subterranean glacial lake covered the floor of the Musco valley; that by glacial deposits its basin became gradually filled with loose stone, gravel, boulders, and other deposits,

but that notwithstanding this it still constituted a large subterranean glacial lake, all the waters of the stream of the basin centering to it, and losing themselves within it, the water sinking beneath the surface and filling it; that across the foot of this lake ran an impenetrable dyke of metamorphic rock forming a barrier over which the overflow water found an outlet and flowed into the channel of the South Fork below the lake, and that this glacial lake constituted the only true source of the South Fork of the Middle Yuba River; and that the stream making out from said lake and emptying into the Middle Yuba constituted the true and only South Fork of the Middle Yuba.

We mention this contention of the respective parties as to what constituted the source of and the South Fork, not for the purpose of examining in detail the evidence which was addressed to their respective claims, but to show how divergent were these claims as to what constituted the South Fork and its source. It is not for us to determine what constituted the South Fork of the Middle Yuba River, or where its source was. That was a matter for the trial court. All that we are called on to consider is, whether as to those matters the findings of the trial court are sustained by the evidence, and that they were, we think, is not open to serious question.

"What are boundaries is matter of law and where they are is matter of fact." (*White* v. *Spreckels,* 75 Cal. 610, 616, [17 Pac. 715, 717].) What the southern boundary of Sierra County is is declared in the statute, but where that boundary is is not so definitely stated, either as to what constitutes the South Fork, or where its source is, so that they can be ascertained without evidence addressed particularly to their establishment. Here the statute simply designated the South Fork of the Middle Yuba River from its source to its junction with the Middle Yuba River and a line from its source to the state line, as the southern boundary. It does not designate where or what the source is, but leaves that matter to be determined, as it can only be, from the testimony of witnesses speaking from actual examination of the ground; those who having sufficient knowledge and experience to so determine had carefully examined the various watercourses, one of which would constitute the South Fork, and after ascertaining which one did so constitute it, had followed it up to the point of its

origin; had examined the physical conditions which would establish the fact of where the source was. When the boundary line of a county is designated by mere indefinite reference to the source of a stream as the point from which a line is to be projected as part of the boundary, and the south fork of a main river as another part, the designation is so doubtful and uncertain that no court can say as a matter of law where the boundaries are. Under such circumstances the whereabouts of the boundaries is a question of fact. Neither does the statute define the South Fork. A stream may have several branches, tending in a southerly direction, and superficial observers might disagree as to what branch in reality constituted the south fork, so that it would be necessary to make an actual traverse of the streams and examination of the topography of the country through which they pass in order to determine as a fact which was the main southerly branch, and, hence, which was the south fork. (*Reynolds* v. *West*, 1 Cal. 322; *Taylor* v. *Fomby*, 116 Ala. 621, [22 South. 910]; *Johnson* v. *Archibald*, 78 Tex. 96, [22 Am. St. Rep. 27, 14 S. W. 266]; *Reynolds* v. *M'Arthur*, 2 Pet. (U. S.) 417; *Rhode Island* v. *Massachusetts*, 39 U. S. 210; *Marsh* v. *Richardson*, 106 N. C. 539, [11 S. E. 522].)

The record in the case before us shows that by abundant evidence consisting of surveys, a topographical model, photographic views, and the testimony of witnesses, some of whom had actually traversed the channel of the stream claimed by the respondent to be the South Fork to its source, the court was fully warranted in finding that the South Fork and its source were as contended for by respondent. The evidence showed that the South Fork of the Middle Yuba River took its source from a number of springs near the summit of the Sierra Nevada Mountains which were fed by almost perpetual snows and flowed thence from the southeast to the northwest between two high mountain ridges which came together on the southeast and formed the entire watershed of that stream; that its waters were derived solely from the melting snows which fell to a great depth on the surrounding mountains during the winter; that it was a torrential stream during the spring and early summer; that its course, which extended about eight miles, was through a continuous channel extending from the source down to and through what is called the

English reservoir to its junction with the Middle Yuba River, the channel having bed and banks and water wash well defined, and having a width in places of as much as eighteen feet, and in other places being as narrow as eight feet.

It is true the evidence shows, that towards the end of every dry season, and when the waters fall in the stream, there are places in the channel of this South Fork above the reservoir which are dry, but a watercourse does not lose its character as such because in dry seasons, or under certain climatic conditions its channel may become dry in places. In fact, the channel is also dry at times in that portion of the South Fork below the reservoir and which appellant contends is the true and only South Fork. As said by Angel on Watercourses: "A watercourse consists of bed, banks and water; yet the water need not flow continually; and there are many watercourses which are sometimes dry. . . . It need not be shown to flow continually as stated above and it may at times be dry; but they must have well defined and substantial existence. . . . (Angel on Watercourses, secs. 3, 4.) There must be a stream usually flowing in a particular direction, but it need not flow continuously. It may sometimes be dry. It must flow in a definite channel having a bed, sides or banks and usually discharge itself into some other stream or body of water." (*Hoyt* v. *City of Hudson,* 27 Wis. 656, [9 Am. Rep. 473].) Many other authorities might be cited to the same effect.

It is hardly necessary to pursue this matter further. It being a question of fact for the determination of the trial court as to where the southern boundary of Sierra County was located, and the evidence being at least conflicting on the point, the finding of the court, as to the source and location of the South Fork arising out of that conflict in favor of respondent, Sierra County, cannot be disturbed on appeal. There was ample evidence, as believed by the court, to sustain the finding made in that respect and it is therefore not open to challenge.

As far as the claim of appellant is concerned, that the English reservoir, or the glacial lake which we have described should have been found to be the source of the South Fork, and that the South Fork consisted only of that portion of the stream below the lake, it is entirely without merit. When the

legislature of 1856 (Stats. 1856, p. 143), defined the northern boundary line of Nevada County, which constituted the southern boundary line of Sierra County, it defined it as "thence up said Middle Yuba River to the mouth of the South Fork of the same; thence up said South Fork to its source; thence due east to the eastern line of the state." From that date until now, and irrespective of other changes which have been made in the boundaries of Sierra County, its southern line has always been defined by the legislature as in effect a line produced from the east line of the state due west to the source of the South Fork, and from said source thence down the stream to its junction with the Middle Yuba River, etc.

When the act of 1856 was passed defining the southern boundary of Sierra County there was no reservoir nor lake known as English Lake or reservoir. That reservoir was not built earlier than 1861, and in the nature of things it is to be assumed, and in fact the expert evidence so discloses, that what is called the glacial lake was fully filled up with debris from the surrounding mountains at that time and covered with a deep alluvial deposit. There is no evidence that there was a lake at that time; that is, that it contained any surface water. It must be assumed that the legislature had full knowledge respecting those matters concerning which it was legislating; that in fixing the boundaries of counties in 1856 by reference to streams, it knew the locality, trend, and source of such streams. If there had been, in the common acceptation of that term, any lake, as contended for by appellant, on the site where the English reservoir was subsequently established, the legislature must have known it, and knowing it if it had intended it to be considered as the source of the South Fork would undoubtedly have so designated it by name. Or, if in 1874 it had intended the English reservoir, which was then in existence, to be deemed the source of the South Fork it would have said so. The fact that it did not is persuasive evidence that it was not intended that the assumed lake, or actual reservoir, was intended to be designated as the source of the South Fork, but the source was intended to be where the legislature must be conclusively presumed to have known it was,—namely, the snow-fed springs of the Sierra Nevada Mountains some five miles above the dam, in which springs the South Fork

had its origin as a stream and from there took its course down to and through the assumed lake, or through the reservoir, and continued its course to the junction of the Middle Yuba. It takes that course now through the site of the reservoir, in a well-defined channel, and from the nature of things must have taken that course before the reservoir was constructed. · It is true that when the act of 1874 establishing the southern boundary of Sierra County was passed the reservoir was in existence and it held its waters backed up in the channel of the South Fork for almost two miles. But this could not make the South Fork any the less the boundary line between the two counties. That channel having been defined by the legislature as the boundary, could not be changed or obliterated by erecting the English dam across it and backing up the waters of the stream. It still remained the channel of the South Fork and the boundary line as fixed by the legislature. This English reservoir instead of being the source of the South Fork, as claimed by appellant to exist only from below the dam to the Middle Yuba River, was but an incident to the main stream—the South Fork—flowing from its source to the Middle Yuba River. The waters gathered in the reservoir were from the South Fork, and its tributaries, as that stream flowed in its channel towards and through the gorge where the dam was built. The creation of the reservoir was effected by blocking the channel at a point where the stream would otherwise naturally flow beyond it. But it was none the less the natural channel of the South Fork, because by artificial means waters were accumulated and spread out and covered the original channel.

We are satisfied that the claim of appellant that the finding of the court that the source, and the location of the South Fork of the Middle Yuba, as claimed in the complaint of plaintiff, was not justified by the evidence, is not well taken.

It is insisted, however, by appellant that even should we conclude that the evidence was sufficient to justify the trial court in its finding as to the source and location of the South Fork that still the judgment should be reversed because the evidence was insufficient to justify the decision of the court to the effect that respondent was entitled to equitable relief against appellant, and because, further, it is claimed there was no evidence to sustain equity in favor of respondent.

We have heretofore stated the allegations of the complaint which were ·made the basis for equitable relief. The court found such allegations to be true. This was warranted under the pleadings because, while appellant insists that these allegations were denied by the answer, our examination of that pleading discloses that they were not. There was no denial that Nevada County had attempted and was attempting to exercise jurisdiction by the levying and collecting of taxes in the territory which the court found was part of Sierra County. In fact it admitted by the answer that it so claimed jurisdiction over the territory north of the line alleged by respondent to be its true southern boundary because it was claimed as territory belonging to Nevada County. The admission of the exercise of jurisdiction, and the assertion of the right to exercise it in the territory claimed to belong to Sierra County, coupled with the fact of the uncertainty and dispute between the counties as to the true boundary line, and the necessity of construing the statute defining such boundary in order to determine its location, show sufficient equity to entitle the respondent to maintain the action against appellant. (*Wetherbee* v. *Dunn*, 36 Cal. 253; *Beatty* v. *Dixon*, 56 Cal. 619.)

Counsel for appellant cite us to no authority supporting their claim to the contrary.

It is further claimed by appellant that respondent was not entitled to equitable relief because it had an adequate remedy at law, it being insisted in that respect that the law provides a special legal remedy for the determination of the disputed boundary line under sections 3969-3972 of the Political Code. These sections provide, that when common boundaries and common corners of counties are not adequately marked by natural objects or lines or by surveys lawfully made, they must be established by surveys jointly made by the surveyors of the counties affected thereby, to be approved by the boards of supervisors of such counties, or by a survey made by the surveyor-general on application of the board of supervisors of any county affected thereby. If the first mode is adopted and the boards of supervisors do not agree, the surveyors must make a report to the surveyor-general with surveys, maps, notes, and explanations touching disputed points. If from such data the surveyor-general can collate a satisfactory description, he must finally determine and establish the com-

mon boundaries and corners.  If the data is insufficient for that purpose he must cause surveys to be made, and when approved by him such surveys establish such common boundaries and corners.  All surveys finally approved under the provisions of the sections are conclusive ascertainments of lines and corners included therein.

No official survey of the boundary between the two litigating counties has ever been made.

It must be conceded that counties have a right to sue and be sued, and that the superior court has jurisdiction in all cases in equity, and that this is an action in equity, but it is insisted by the appellant that under the provisions of the. code to which we have referred, a mode is fixed by the legislature whereby the boundaries of counties must be ascertained; that this legal remedy must be exhausted before the matter of conflicting boundaries can be presented for judicial determination in a court of equity.  (*People ex rel. Borrell* v. *Boggs*, 56 Cal. 648.)

In the case cited it appears that the action was brought by a taxpayer against the tax-collector of Napa County to recover money paid for taxes under protest, his claim being that the property assessed was in Sonoma County and not in Napa County.  The boundary line between the two counties had been approved by the surveyor-general.  Plaintiff attempted to prove that the approved survey by the surveyor-general was erroneous, but the trial court refused to admit the testimony, holding the action of the surveyor-general regarding it conclusive.  This court approved the judgment, holding to the same view.  The point was there made that section 3972 declaring the approval by the surveyor-general conclusive was unconstitutional, as investing that officer with judicial power. In answer to this it was said: "We do not think that the functions exercised by him are judicial in their character; he is not, under that section, to decide what is the law.  The legislature had already, in regard to the boundary between the two counties fixed the law; viz., that the summit of the dividing ridge should be the dividing line.  We think it was competent for the legislature to direct its officer to go upon the ground and run his lines along that ridge; and in doing so, he was acting merely in a ministerial capacity; and we think that it was competent for the legislature to declare that

the lines so run, that is, the location of the boundary line upon the ground, should be thereby defined and fixed."

But it is obvious that the question presented in the case at bar, and the matter before the court in the case cited, call for the application of different principles of law. In the case cited the court grounded its conclusion on the fact that the statute defining the boundary had fixed the boundary line of the counties as the summit of the dividing ridge, and that the act which the code section directed the surveyor-general to do with reference to the establishment of said boundary, was simply to go on the ground and in his ministerial capacity run his lines along the ridge. Of course, where the legislature has fixed a boundary along a ridge, a well-defined course readily determinable and ascertainable, there is no action on the part of the surveyor-general called for but to run his survey line thereon on the ground. Where the language of an act so clearly defines the line that there is nothing to be done but run a survey along it, there is no room for question, but the sections of the code relied on by appellant furnish a plain, speedy, and adequate remedy for the establishment of the line, and that a court of equity cannot be called upon to do what the law in the first instance provided for having done. But this legal remedy can only be availed of where the language of an act defining a boundary is clear. Where it is not clear, and where the description of the boundary is of doubtful import, or where it requires the interpretation of a court to ascertain what is meant by the language of the statute when mentioning localities, natural objects, or sources of streams as matters of boundary, the sections of the code have no application. To leave the construction or interpretation of doubtful language used in a statute to the determination of the surveyor-general would be to confer upon that officer judicial functions which under the constitution may not be done. The construction of doubtful language, and the interpretation of language used by the legislature are matters exclusively for the courts. When the courts have interpreted the language of the act, and declared what the boundaries in dispute are as matter of law, then only can surveyors or the surveyor-general act, and they act then in establishing the line on the ground solely in a ministerial capacity, and where the court has interpreted, from the in-

definite or doubtful language of a statute, the legislature intended to fix it.

Now it will be observed by reference to the language of the statute fixing the southern boundary of Sierra County which we have heretofore quoted that the location from which the point on the state line is to ·be fixed is due east from the "source of the South Fork of Middle Yuba River." The source of a stream is defined to be "the spring or fountain-head from which its supply of water proceeds; any collection of water within or upon the surface of the earth from which a stream originates." (New Revised Ency. Dic.) And as said by the trial court in discussing the present objection of appellant on demurrer to the complaint: "This definition when applied to a torrential stream in the high Sierras makes the said language, or the meaning of it, very doubtful. It is but common knowledge that such stream has many and varied sources usually covering a large extent of watershed, and varying in length as it extends into said watershed. The legislature did not mean that all such sources should govern in locating the point on the state line. Which one, if more than one, was meant in this case? Did it mean the summit of the ridge at the head of the main stream which collects the volumes of water from melting snows into the main channel? The meaning of the legislature in these respects must be determined before a survey can be correctly made. The source of the stream as intended by the act must be definitely fixed as a starting point. Will it be contended that the surveyor-general is authorized to do this? Under the language of the supreme court in *People ex rel Borrell* v. *Boggs,* 56 Cal. 648, we think not. It would be calling on him to declare what the law was. The court alone can do this under the rule which the law provides for construing statutes. Sections 1858-1859 of the Code of Civil Procedure, or as the supreme court in the case of the *County of Mariposa* v. *County of Madera,* 142 Cal. 52, [75 Pac. 572], says: 'The only question to be considered is the proper construction of special statutes, and certain sections of the Political Code relating to the disputed boundary. We have in other words merely to determine the intention of the legislature according to the established rules of statutory construction.' This is all this court is asked to do in the case at bar, for when the source of the South Fork of the Middle Fork of the Yuba

River is fixed according to the intention of the legislature, the marking of the line on the ground will be but the work of the surveyors."

We think this is the correct view. The common boundary between the counties, as far as the question is involved here, is the South Fork running from its source to its junction with the Middle Yuba, and a line projected from its source to the state line east. What the source of the South Fork is is not definitely fixed or determined by the act, and could only be determined by judicial inquiry to ascertain its location. It is only upon its ascertainment that the line therefrom to the state line could be run, or a surveyor be able to locate by survey the line called for. If it could be said that it was purely a ministerial act of the surveyor-general to ascertain from the language used in the act this source and make his survey accordingly, it would be difficult to conceive of a case where the language of an act could be so uncertain or indefinite as to boundaries of a county, or with reference to any point from which boundaries were to be measured, so that a court of equity could be ever invested with jurisdiction to construe the language of an act and determine as matter of law what the boundaries intended to be fixed by it were.

These are the only matters requiring consideration.

The judgment appealed from is affirmed.

Henshaw, J., and Melvin, J., concurred.