[Sac. No. 6654. In Bank. Mar. 7, 1958.]

COUNTY OF ALPINE, Appellant, v. COUNTY OF TUOLUMNE et al., Respondents.

Ward H. Coffill and Jeremy C. Cook for Appellant.

James H. Phillips as Amicus Curiae on behalf of Appellant.

Ross A. Carkeet, Special Counsel (Tuolumne), Hardin & Gorgas, James R. Hardin, Joseph S. Huberty, District Attorney (Calaveras), and Anthony A. Caminetti, Jr., District Attorney (Amador), for Respondents.

SCHAUER, J.—Plaintiff Alpine County appeals from a judgment of dismissal entered pursuant to an order sustaining defendant counties' demurrers to the amended complaint without leave to amend. By its complaint Alpine seeks a judicial determination of the boundary between it and defendant counties, and to restrain those counties from exercising jurisdiction over certain territory alleged to be situated within the boundaries of Alpine. Each of the defendants demurred on the grounds that the complaint does not state a cause of action, that the court has no jurisdiction of the persons of the defendants or of the subject of the action, and that there is another action pending between the parties for the same causes alleged in the complaint. We have concluded that the complaint states a cause of action for judicial interpretation of an unclear boundary line statute, that the court has jurisdiction over the matter, that the complaint does not show that any other action is pending between the parties on a similar cause, and that the judgment of dismissal should therefore be reversed.

The boundaries of Alpine County are defined in section 23102 of the Government Code as follows: "Beginning at the north corner, at a point where the state line crosses the east summit of the Sierra Nevada Mountains . . .; thence southwesterly along said summit to a point two miles west of James Green's house, in Hope Valley, called Thompson's Peak; thence southwesterly in a direct line to a point on the Amador and Nevada turnpike road in front of Z. Kirkwood's house . . .; thence south across the north fork of the Mokelumne River to the road leading from West Point, in Calaveras, to Big Tree road, near the Big Meadows; thence easterly along said West Point road to the Big Tree road; thence easterly in a direct line to where the Sonora trail strikes the middle fork of the Stanislaus River; thence easterly along said trail to the summit of the Sierra Nevada Mountains; thence northerly along said summit of the dividing ridge between the West Walker and Carson Rivers; thence northeasterly along said dividing ridge to the state line . . .; thence northwest along said state line to the place of beginning."

By resolutions dated June 16, 1950, and July 21, 1950, the Board of Supervisors of Alpine County petitioned the State Lands Commission to investigate and survey the problem of a disputed boundary common to Alpine and Tuolumne Counties, and by resolution dated July 6, 1953, the same board made the same request with respect to Alpine's common boundaries with Amador and Calaveras Counties. The only source of authority of the State Lands Commission to act in a matter of this type is section 23171 of the Government Code read together with section 6204 of the Public Resources Code. Section 23171 provides that "All common boundaries and common corners of counties not adequately marked by natural objects or lines, or by surveys lawfully made, shall be definitely established by surveys made jointly by the surveyors of all the counties affected, and approved by the boards of supervisors of the counties, or by a survey made by the State Lands Commission, on application of the board of supervisors of any county affected." Section 6204 of the Public Resources Code states that "The [state lands] commission shall when required, survey and mark the boundary lines of counties and cities."

According to the subject pleading, the dispute as to the boundaries here involved arose from two sources: (1) uncertainty as to the terminal point of the line running south from Z. Kirkwood's house "to the road leading from West Point, in Calaveras, to Big Tree road, near the Big Meadows"; and (2) uncertainty as to the location of "the Sonora trail," as those terms are used in the statutory boundary description of Alpine.

Pursuant to the above mentioned requests of Alpine's Board of Supervisors, the State Lands Commission undertook investigations and conducted hearings in an effort to determine the true boundary line. Subsequently, certain findings adverse to the position of Alpine were approved by the commission. Alpine then instituted the present action, and the commission suspended its proceedings pending the outcome of this litigation.

In its complaint Alpine alleges that "there is, and for many years last past has been, dispute and disagreement and uncertainty existing between" Alpine and Amador, Calaveras, and Tuolumne Counties due to the above mentioned uncertainties in statutory boundary descriptions; that the exact location of the boundary lines in question "is in dispute and has never been actually or judicially determined"; that no survey mark-

ing the lines at the disputed points "can be made until the [uncertainties in location are] judicially determined"; that defendant counties have been encroaching in certain specified respects on the jurisdiction of Alpine County, over the protest of Alpine, on certain portions of Alpine lying to the east and north of the true boundary line; and that Alpine "has no adequate remedy at law or by administrative process." Alpine prays for a judicial determination of the western and southern boundary lines of the county, and for a decree enjoining defendant counties from asserting jurisdiction over the land areas lying east and north of the court-determined line and from receiving or using funds from the United States Forest Service based on acreage of national forest lands within the disputed areas. As noted earlier, demurrers of Amador, Calaveras, and Tuolumne Counties to this complaint were sustained without leave to amend, and Alpine appeals from the judgment of dismissal thereafter entered.

The crucial question presented is whether the courts have any jurisdiction over the controversy in its present state, or whether Alpine is precluded from judicial relief until the administrative agency (the State Lands Commission) has finally determined the issues tendered to it. We have concluded, for reasons hereinafter stated, that primary jurisdiction in this case rests in the courts, and that the courts are not required to delay their proceedings until the commission has concluded its hearings.

Defendant counties contend that under the above quoted provisions of section 23171 of the Government Code and section 6204 of the Public Resources Code, the State Lands Commission is granted the power to settle boundary disputes by surveying and marking the true boundary line, and therefore Alpine cannot seek judicial relief until the administrative proceedings requested by Alpine are concluded. ▉ It is true that in sections 23171-23175 of the Government Code the law provides a special remedy for the determination *by survey* of inadequately marked boundary lines. Such a survey, when properly made and finally approved, is conclusive of the subject lines and corners. (Gov. Code, § 23175; *People* v. *Boggs* (1880), 56 Cal. 648.)

However, it is to be noted that sections 23171-23175 are located in Government Code, title 3, division 1, dealing with "Counties Generally." Article 2 of chapter 2 of that division defines the boundaries of the several counties and is followed by article 3 which relates to "Settlement of Boundary Dis-

putes." Section 23171 is found in article 3 and, as hereinabove mentioned, provides that "All common boundaries and common corners of counties not adequately marked by natural objects or lines . . . shall be definitely established by surveys . . ." and section 23173, also in article 3, declares that "Upon the reports made by the county surveyors the State Lands Commission shall finally determine and establish the common boundaries and corners, if it can collate a satisfactory description therefrom. If the reports are insufficient for the purpose, it shall cause surveys to be made, and when approved by it, the surveys establish the common boundaries and corners."

■ It is manifest that the language of the sections above quoted relates to the "determination" of disputed boundary lines only through the making of surveys to *mark the boundary lines defined by the Legislature* in article 2, not to define those lines by interpreting legislative language which leaves uncertain the point where the survey shall start or the courses it must follow.

In respect to disputes of the latter character (i.e., those which involve not merely running a survey to mark legally defined lines but, rather, conducting a proceeding to legally define the lines so that thereafter they can be marked on making a survey) it is clear from the language above quoted, read in the context of related provisions, that the legislative plan contemplates resolution by judicial proceedings. In this connection, it is noted that section 23178 of article 3 provides that "Whenever a common boundary . . . has been legally established in accordance with Article 3 of this chapter, or by judicial proceedings," etc. Furthermore, we find that in title 5, division 1, chapter 5, of the same code, dealing specifically with "Boundaries" and proceedings to establish them, section 51000 provides that "When the location of a boundary line of a local agency[1] is indefinite or uncertain, or the boundary line has been obliterated from any cause, it may be determined, defined, and established pursuant to this chapter." Section 51001 declares that "The legislative body of the local agency having an indefinite, uncertain, or obliterated boundary may cause a proceeding to be brought in the name of the local agency to have the boundary line determined, defined, and established." In the proceeding thus instituted, "The [superior] court shall determine the location of the boundary line

---

[1]The term "local agency" as used in the subject portion of the code refers to "county, city, or city and county" (Gov. Code, § 50001).

by courses and distances or by giving such other definite description as is necessary or desirable.'' (Gov. Code, § 51007.) After the court has determined the boundary line, a copy of its judgment is filed with the Secretary of State (Gov. Code, § 51008), and ''From the date of filing, the boundary line is established and fixed for all purposes and constitutes the true and official boundary line of the local agency'' (Gov. Code, § 51009). Sections 51000-51009 of the Government Code were derived from a statute first enacted in 1921 (Stats. 1921, chap. 838, p. 1607) which contained almost identical language. In *City of Crescent City* v. *Dodd* (1933), 131 Cal.App. 153 [21 P.2d 140], it was held that this latter statute ''furnishes a full and complete remedy to cities [and counties], and by its provisions allows a full and complete investigation as to indefinite or uncertain boundaries; allows the introduction of testimony and maps, and gives a direct method of determining the true boundaries of cities, towns and counties,'' and under such circumstances ''a complete remedy is afforded'' in the courts.

Two procedures for determining boundary lines are thus provided in the Government Code. However, while section 23171 provides that the State Lands Commission may make a survey, on request, when a common boundary is ''not adequately marked by natural objects or lines, or by surveys lawfully made,'' section 51000 provides for a judicial determination when the boundary is ''indefinite or uncertain, or . . . obliterated.'' It thus appears that the legislative plan contemplates that the two methods are not necessarily alternative in a given case; rather, that the provisions of sections 51000-51009 may be invoked where the language of the boundary statute is unclear as well as where the line has been obliterated, while the remedy provided by sections 23171-23175 is to be availed of only where the language of the boundary statute is clear and only ministerial action on the part of the surveyor in adequately marking the line is required. In other words, where the language used by the Legislature is ''indefinite or uncertain,'' construction of such language is a matter exclusively for the courts, and the location of the boundaries is a question of fact to be judicially determined. (*County of Sierra* v. *County of Nevada* (1908), 155 Cal. 1, 13 [99 P. 371].) The foregoing construction is in accord with the generally recognized rule that while the fixing and defining of county boundaries is a legislative function, the interpretation of a statute so fixing such boundaries is a judicial func-

tion, to be exercised by the courts. (*Roy O. Martin Lumber Co.* v. *Baird* (1954), 225 La. 14 [71 So.2d 865, 868]; *Ballard* v. *W. T. Smith Lumber Co.* (1953), 258 Ala. 436 [63 So.2d 376, 378 [3]]; 2 McQuillin, Municipal Corporations, 261, § 7.05.)

In the case of *County of Sierra* v. *County of Nevada* (1908), *supra,* 155 Cal. 1, there was a dispute as to the boundary line between Sierra and Nevada Counties. The boundary statute there involved provided in pertinent part that the line ran "west to the source of and down the South Fork and Middle Yuba River." The dispute related to the location of the "source of the South Fork." (P. 4 of 155 Cal.) No official survey of the boundary between the two litigating counties had ever been made. The trial court determined the location in question and this court affirmed the judgment as based upon substantial evidence.

It was contended in the Sierra case that under the provisions of sections 3969-3972 of the Political Code (now Gov. Code, §§ 23171-23173, 23175) a mode was "fixed by the legislature whereby the boundaries of counties must be ascertained; that this legal remedy must be exhausted before the matter of conflicting boundaries can be presented for judicial determination in a court of equity. (*People* ex rel. *Borrell* v. *Boggs* [(1880), *supra*], 56 Cal. 648.)" (*County of Sierra* v. *County of Nevada* (1908), *supra,* 155 Cal. 1, 12.) The court in rejecting such contention held (pages 13-15): "[I]t is obvious that the question presented in the case at bar, and the matter before the court in the case cited, call for the application of different principles of law. In the case cited the court grounded its conclusion on the fact that the statute defining the boundary had fixed the boundary line of the counties as the summit of the dividing ridge, and that the act which the code section directed the surveyor-general [the predecessor of the State Lands Commission] to do with reference to the establishment of said boundary, was simply to go on the ground and in his ministerial capacity run his lines along the ridge. Of course, where the legislature has fixed a boundary along a ridge, a well-defined course readily determinable and ascertainable, there is no action on the part of the surveyor-general called for but to run his survey line thereon on the ground. Where the language of an act so clearly defines the line that there is nothing to be done but run a survey along it, there is no room for question, but the sections of the code relied on by appellant furnish a plain, speedy, and adequate remedy for the establishment of the

line, and that a court of equity cannot be called upon to do what the law in the first instance provided for having done. But this legal remedy can only be availed of where the language of an act defining a boundary is clear. Where it is not clear, and where the description of the boundary is of doubtful import, or where it requires the interpretation of a court to ascertain what is meant by the language of the statute when mentioning localities, natural objects, or sources of streams as matters of boundary, the sections of the code have no application. . . . When the courts have interpreted the language of the act, and declared what the boundaries in dispute are as a matter of law, then only can surveyors or the surveyor-general act, and they act then in establishing the line on the ground solely in a ministerial capacity . . . What the source of the South Fork is is not definitely fixed or determined by the act, and could only be determined by judicial inquiry to ascertain its location. It is only upon its ascertainment that the line therefrom to the state line could be run, or a surveyor be able to locate by survey the line called for. If it could be said that it was purely a ministerial act of the surveyor-general to ascertain from the language used in the act this source and make his survey accordingly, it would be difficult to conceive of a case where the language of an act could be so uncertain or indefinite as to boundaries of a county, or with reference to any point from which boundaries were to be measured, so that a court of equity could be ever invested with jurisdiction to construe the language of an act and determine as matter of law what the boundaries intended to be fixed by it were.''

The Sierra case appears indistinguishable from the case at bar as to the pertinent issues involved. The record in this case discloses that there are four possible locations of the ''Sonora trail,'' that the location of the ''West Point road'' is similarly uncertain, and that the uncertainty as to the true location of these points is the cause of the present boundary disputes. Which of the several possible locations of these markers was intended by the Legislature to delineate the boundaries of Alpine County is a fact question to be determined by the courts. It follows from the foregoing that the State Lands Commission is not empowered to settle the boundary disputes in this case, and that Alpine's action is tenable. The complaint alleges the cause and nature of the disputes, Alpine's interpretation of the language in question, and the acts of defendant counties which are claimed to con-

stitute infringements on Alpine's rights; such complaint states a cause of action for the relief sought.

 Defendant counties further urge that one of the duties of the State Lands Commission is to determine whether a boundary line has been fixed because of mutual use and recognition within the meaning of either section 23170[2] or section 23177[3] of the Government Code, and therefore that the courts cannot in any event act in this case until the commission has completed its determination on this matter. This argument also is untenable.

To begin with, the commission is not empowered to determine the applicability of the mutual recognition statutes. An administrative agency can act only as to those matters which are within the scope of the powers delegated to it. (*State Comp. Ins. Fund* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 264, 266 [2] [125 P.2d 42] (Industrial Accident Commission); *Wheeler* v. *City of Santa Ana* (1947), 81 Cal.App. 2d 811, 816 [1] [185 P.2d 373] (Civil Service Commission); 2 Cal.Jur.2d 30, § 16.) The powers delegated to the State Lands Commission deal generally with title to and usage of public lands, minerals and oil and gas on such lands, and navigable waters of the state. (Pub. Resources Code, § 6216.) Aside from section 6204 of the Public Resources Code (*ante*, p. 791) no reference to city or county boundary lines is made in the statutes establishing the commission and defining its powers, and no power to fix or ascertain such boundaries with reference to usage and custom is expressly or impliedly conferred. (See Pub. Resources Code, §§ 6101-6223; see also California Administrative Code, tit. 2, div. 3, ch. 1.) The sole power conferred on the commission with respect to boundary lines is to "survey and mark" them; the power to make a prior determination that the statutory line has been altered by mutual use and recognition is neither expressly nor impliedly included in the powers conferred, for such determina-

---

[2]Government Code, section 23170, provides as follows:

"Every common boundary between counties which has been mutually recognized and used by the counties adjacent thereto for the purpose of assessment and collection of taxes for a period of 25 years continuously prior to July 30, 1927, is confirmed, validated, and declared to be legally established."

[3]Government Code, section 23177, provides as follows:

"Every common boundary between counties which has been mutually used by the counties adjacent thereto for the purpose of the assessment and collection of taxes for a period of 15 years continuously prior to the effective date of this section [September 22, 1951] is hereby confirmed, validated, and declared to be legally established."

tion is not a necessary part of the ministerial function of surveying and marking.

The mutual recognition statutes represent a codification of the common law doctrine of acquiescence. (See 2 McQuillin, Municipal Corporations, 274-276, § 7.09; *Starry* v. *Lake* (1933), 135 Cal.App. 677, 682 [28 P.2d 80].) That doctrine is properly invoked in fixing a boundary line where, as here, the true location of the line is uncertain. (*City of Alameda* v. *City of Oakland* (1926), 198 Cal. 566, 576 [2] [246 P. 69].) But, as noted hereinabove, where the location of a boundary line is in dispute because of uncertainty or indefiniteness in the statutory description, primary jurisdiction over the dispute is in the courts rather than the administrative agency. Since the State Lands Commission has no primary jurisdiction in the case of a disputed boundary line where the dispute is based upon an unclear definition in a boundary statute, and since the applicability of sections 23170 and 23177 of the Government Code in this case is merely a facet of a boundary dispute of the type mentioned, it follows that the commission has no power to make any initial determination of the true boundaries here involved, whether based on the mutual recognition statutes or otherwise.

Defendants rely on the established rules that "where an administrative remedy is provided by statute, relief must be sought before the administrative body and this remedy exhausted before the courts will act" (*Abelleira* v. *District Court of Appeal* (1941), 17 Cal.2d 280, 292 [6] [109 P.2d 942, 132 A.L.R. 715]), and that "it lies within the power of the administrative agency to determine in the first instance, and before judicial relief may be obtained, whether a given controversy falls within the statutory grant of jurisdiction" (*United States* v. *Superior Court* (1941), 19 Cal.2d 189, 195 [3] [120 P.2d 26]). But these rules are inapplicable where, as here, the agency is given no jurisdiction to make a judicial determination of the type involved. Alpine's erroneous request to the commission to determine the disputed boundaries could not invest the commission with jurisdiction beyond that conferred on it by law or estop Alpine from pursuing its proper remedy.

Once the court has determined the boundaries here involved, based either on a legal interpretation of the allegedly uncertain language contained in section 23102 of the Government Code, or on the terms of the mutual recognition statutes if such statutes are found to be applicable, and the facts as the

court may find them, then the State Lands Commission may well have jurisdiction, if called upon, to proceed with its survey and to mark the true line as judicially determined. However, in accordance with the principles hereinabove enunciated, the initial determination of the boundaries in question must be made by the courts, and it was error for the trial court to have sustained defendants' demurrers without leave to amend.

For the foregoing reasons the judgment is reversed and the cause is remanded to the trial court with directions to overrule the demurrers and permit the defendants to answer, if they be so advised, within such reasonable time as the court may fix.

Shenk, J., Carter, J., Spence, J., and McComb, J., concurred.

TRAYNOR, J.—I dissent.

Sections 23171-23175 of the Government Code provide an administrative procedure and sections 51000-51009 of that code provide a judicial procedure for determining disputed boundaries. Plaintiff was therefore entitled in the first instance to invoke one procedure or the other. (*City of Susanville* v. *Lee C. Hess Co.*, 45 Cal.2d 684, 689 [290 P.2d 520]; *Scripps Memorial Hospital, Inc.* v. *California Emp. Com.*, 24 Cal.2d 669, 673 [151 P.2d 109, 155 A.L.R. 360]; see *River Plate & Brazil Conferences* v. *Pressed Steel Car Co.*, 227 F.2d 60, 64.) Since it elected to proceed before the State Lands Commission before this action was commenced, the trial court correctly concluded that the alternative remedy was not available. When "two or more tribunals in this state have concurrent jurisdiction, the tribunal first assuming jurisdiction retains it to the exclusion of all other tribunals in which the action might have been initiated. . . . One reason for the rule is to avoid unseemly conflict between courts that might arise if they were free to make contradictory decisions or awards at the same time or relating to the same controversy; another reason is to protect litigants from the expense and harassment of multiple litigation." (*Scott* v. *Industrial Accident Com.*, 46 Cal.2d 76, 81-82 [293 P.2d 18].) The Scott case makes clear that the rule is equally applicable when one of the tribunals is an administrative agency. (See also *Elbert* v. *Johnson*, 164 F.2d 421, 423-424; *Majors* v. *Thompson*, 235 F.2d 449, 452; *United States* v. *Interstate Commerce Com.*, 337 U.S. 426, 434 [69 S.Ct. 1410, 93 L.Ed. 1451].)

This rule makes good sense and should be followed in the present case. Pursuant to plaintiff's request, the State Lands Commission held extensive hearings and it has approved findings that are sufficient to permit an accurate survey to be made. By holding that it has no jurisdiction to resolve the boundary dispute, the majority not only render the commission's work nugatory, but permit plaintiff to harass defendants by compelling them to relitigate the dispute in another proceeding after the tribunal first selected by plaintiff made findings adverse to it. The orderly administration of justice demands that plaintiff abide by its election. Having chosen the administrative remedy, it must seek judicial relief by way of review of the commission's decision, not by an independent action.

Government Code, section 23175, providing that "Any survey finally approved pursuant to this article is a conclusive ascertainment of the lines and corners included in the survey," does not negate the right to judicial review of the commission's action, for if review is available, approval of a survey is not final until the commission's action has been affirmed or the time for seeking review has elapsed. *People* v. *Boggs*, 56 Cal. 648, is not to the contrary, for in that case the survey was not attacked in a proceeding brought to review the agency's action, but in a collateral proceeding brought to recover taxes paid under protest. Moreover, Code of Civil Procedure, section 1094.5, now expressly provides for the review of the commission's proceedings, even though it is not one of the agencies enumerated in the Administrative Procedure Act. (Gov. Code, § 11501.) "The framers of section 1094.5 intended it to set forth 'the procedure by which judicial review can be had by the writ of mandate after a formal adjudicatory decision by *any* administrative agency.' (Emphasis added; see Tenth Biennial Report of the Judicial Council of California, Appendix A, p. 45.)" (*Temescal Water Co.* v. *Department of Public Works*, 44 Cal.2d 90, 101 [280 P.2d 1].) By its terms section 1094.5 applies "for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer." Commission determination of the location of a disputed landmark or whether a boundary had been mutually recognized or used for a period sufficient to "legally establish" it (Gov. Code,

§§ 23170, 23177) is a quasi-judicial function and accordingly, in the absence of any provision to the contrary, the requirement of a hearing is implied. (*Fascination, Inc.* v. *Hoover,* 39 Cal.2d 260, 271 [246 P.2d 656]; *Ratliff* v. *Lampton,* 32 Cal.2d 226, 230 [195 P.2d 792, 10 A.L.R.2d 826]; *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47, 53 [162 P.2d 13]; *Steen* v. *Board of Civil Service Com.,* 26 Cal.2d 716, 723-725 [160 P.2d 816]; *Carroll* v. *California Horse Racing Board,* 16 Cal.2d 164, 168 [105 P.2d 110]; *cf., Keeler* v. *Superior Court,* 46 Cal.2d 596, 599 [297 P.2d 967]; *DiGenova* v. *State Board of Education,* 45 Cal.2d 255, 259-260 [288 P.2d 862].) Moreover, since the commission has been granted the power of the head of a department of the state under Government Code, sections 11180 to 11191 (Pub. Res. Code, § 6103), it is fully equipped to meet the hearing requirement. Its powers include the power to make investigations concerning all matters relating to the subjects under its jurisdiction; to inspect books and records; to hear complaints; to administer oaths; to issue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents and testimony in any inquiry, investigation, hearing or proceeding pertinent or material thereto in any part of the state; to delegate its investigative and hearing powers to an officer of the commission; to petition the superior court in the county in which the hearing is pending for an order compelling witnesses to attend and testify or produce the papers required; and to cause the depositions of persons residing within or without the state to be taken by petitioning the superior court of Sacramento County. Any party to a commission hearing has the right to the attendance of witnesses in his behalf at the hearing or upon deposition. Such provisions are adequate to enable the commission to proceed and they demonstrate that it has the power sought to be exercised here.

The majority hold, however, that the administrative remedy "provided by sections 23171-23175 is to be availed of only where the language of the boundary statute is clear and only ministerial action on the part of the surveyor in adequately marking the line is required. In other words, where the language used by the Legislature is 'indefinite or uncertain,' construction of such language is a matter exclusively for the courts, and the location of the boundaries is a question of fact to be judicially determined." Such a limitation on the commission's power is unworkable, productive of waste, and casts a cloud on the validity of all of its determinations.

Whether the language of the statute is indefinite or uncertain may appear only after it is sought to be correlated with objects on the ground. Apparent clarity may disappear only in the light of extensive surveys undertaken by the commission that will then go for nought, and disputants will be enabled to relitigate settled boundaries, not because they were erroneously determined, but only because ambiguity in the statutory language can be demonstrated. The applicable statutes themselves refute any such limitation on the commission's powers.

There is no occasion to invoke sections 23171 to 23175 unless there is a dispute as to the location of the landmarks and lines establishing boundaries. Not only are those sections included in the article of the Government Code entitled "Settlement of Boundary Disputes" (tit. 3, div. 1, ch. 2, art. 3) but their very purpose is the settlement of such disputes. If there is any need to have a boundary "definitely established" it can arise only because of doubt as to its location, either because, in the language of section 23171, "all common boundaries and common corners" are "not adequately marked by natural objects or lines" or because such boundaries and corners are not adequately marked by "surveys lawfully made." It is only because of uncertainty as to the adequacy of the markings of common boundaries and corners or the legality of previous surveys that boards of supervisors of the counties affected are authorized to apply to the commission and the commission is given jurisdiction definitely to establish such "common boundaries" and "common corners." Section 23172 explicitly provides for reports by county surveyors "to the State Lands Commission, with surveys, maps, notes, and explanations touching *disputed* points." (Italics added.) If these reports are insufficient to enable the commission to collate a satisfactory description therefrom, the commission "shall cause surveys to be made, and when approved by it, the surveys establish the common boundaries and corners." (Gov. Code, § 23173.) There would be no purpose in reporting to the commission about "disputed points" with "surveys, maps, notes, and explanations" if the commission did not have power to settle the "disputed points." The commission's jurisdiction to establish by surveys common boundaries and corners necessarily includes jurisdiction to determine in the first instance the meaning of the statutory language defining the boundary or the existence of facts bringing into play the mutual recognition and use statutes (Gov. Code, §§ 23170,

23177), for only after it has decided such preliminary questions, can a final survey be undertaken. "A public officer or board has not only the powers expressly enumerated by law, but also those implied powers which are necessary to the exercise of the powers expressly granted." (*Crawford* v. *Imperial Irrigation Dist.*, 200 Cal. 318, 334 [253 P. 726].) The majority concede that if the language of the boundary statute were clear, the commission could act upon it to establish a boundary by survey. The power to do so is just as essential to the commission's function when the language is unclear, and nothing in the statutes justifies the distinction that the majority make. It is ironic that the commission is denied authority to act in the very situations in which the disputes it is empowered to settle are most likely to arise.

Language in *County of Sierra* v. *County of Nevada*, 155 Cal. 1 [99 P. 371], unquestionably supports the position taken by the majority herein. In that case, however, the court was reviewing a judgment that had determined a disputed boundary after a full trial in the trial court. The plaintiff had not invoked the administrative remedy but after an adverse judgment sought to switch to another tribunal. It may reasonably be assumed that the court was reluctant to reverse a judgment entered after a full and accurate determination of the issues solely because another remedy had not been invoked. In any event, to sustain its decision it was only necessary for the court to hold that the administrative remedy was not exclusive. It was not necessary to hold that the administrative remedy did not exist. The precise problem there presented is now governed by statutes allowing the plaintiff an election of remedies in the first instance (Gov. Code, §§ 51000-51009), so it is unnecessary to determine whether the court erred in the Sierra case in holding in effect that the administrative remedy was not exclusive. Obviously, however, the language in that decision indicating that the Legislature could not constitutionally invest the State Lands Commission with authority in the first instance to determine the questions involved in this case should be disapproved. The power to find facts upon which the application of a statute depends is an essential part of administrative authority. In 1917 this court said, "from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are

intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as the supreme court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be "to stop the wheels of government" and bring about confusion, if not paralysis, in the conduct of the public business.' " (*Gaylord* v. *City of Pasadena,* 175 Cal. 433, 436-437 [166 P. 348].)

More recent decisions of this court resting on the premise that "judicial functions" cannot constitutionally be given to a state-wide agency have at most given a broad scope to judicial review of agency action. (*Standard Oil Co.* v. *State Board of Equalization,* 6 Cal.2d 557 [59 P.2d 119]; *Whitten* v. *California State Board of Optometry,* 8 Cal.2d 444 [65 P.2d 1296, 115 A.L.R. 1]; *Drummey* v. *State Board of Funeral Directors,* 13 Cal.2d 75 [87 P.2d 848]; *Bodinson Mfg. Co.* v. *California Employment Com.,* 17 Cal.2d 321 [109 P.2d 935]; *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457]; *Dare* v. *Board of Medical Examiners,* 21 Cal. 2d 790 [136 P.2d 304]; *Sipper* v. *Urban,* 22 Cal.2d 138 [137 P.2d 425]; *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20].) They have not gone so far as to deny any administrative agency the power in the first instance to pass upon questions of law or fact. Certainly, fixing the location of a disputed landmark or determining whether a boundary line has been mutually recognized for a sufficient time legally to establish it is no more an exclusive function of courts than determining the extent of the penalty for violation of the Insurance Code (*Nardoni* v. *McConnell,* 48 Cal. 2d 500, 507 [310 P.2d 644]) or determining whether there is unappropriated water available for an applicant (*Temescal Water Co.* v. *Department of Public Works,* 44 Cal.2d 90, 106 [280 P.2d 1]), to cite but two recent instances in which this court has upheld the exercise of quasi-judicial power by a state-wide administrative agency. (See also dissenting opinion in *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831, 859-862 [123 P.2d 457] and cases cited.) Clearly

the reasons given for the decision in the Sierra case were aberrational, and they should not be given fresh currency now merely because this is another boundary dispute case.

The judgment should be affirmed.

Gibson, C. J., concurred.

Respondents' petition for a rehearing was denied April 2, 1958. Gibson, C. J., and Traynor, J., were of the opinion that the petition should be granted.